■ In the Matter of SLOAN's SUPERMARKETS, INC., et al., Petitioners, v RODERICK G. W. CHU et al., Constituting the State Tax Commission of the Department of Taxation and Finance of the State of New York, Respondents.—Levine, J.

Petitioners are related corporations owning and operating a chain of supermarkets in the New York City area. Petitioner Fineway Supermarkets, Inc. (hereinafter Fineway) became part of the corporate conglomerate through acquisition in 1977. The Audit Division of the Department of Taxation and Finance conducted three sales and use tax audits of petitioners' operations covering in aggregate the period from June 1, 1973 through August 31, 1980, which resulted in additional sales and use tax assessments. Each audit employed a test-period method from which the tax liability was projected.

The first audit covered sales and use taxes from June 1, 1973 through May 31, 1977 for petitioners' 35 stores, exclusive of the Fineway stores acquired. The test-period audit was of petitioners' records at two stores for the month of April 1976. Initially, the auditor used the "purchase method" of conducting the audit as to sales tax, analyzing petitioners' purchases from which she arrived at a percentage ratio of purchases of taxable items to purchases of nontaxable items, and then added the applicable markups to arrive at the total taxable sales (see, Matter of Licata v Chu, 64 NY2d 873, 874). Based upon this method, the audit would have established an overpayment of sales tax for the entire four-year period. Ultimately, the auditor employed an alternative "underpayment method" for the test period, in which, using petitioners' records compiled from cash register tapes, the sales tax paid were compared to the total sales tax recorded on the cash registers, giving rise to a percentage of underpayment which was then projected over the four-year period to establish a deficiency. As to the use tax, the audit of the April 1976 test period disclosed invoices for advertising expenses aggregating $716.97 out of a total of $1,351.47, or some 53% of such costs, in which a sales tax was not separately itemized. This percentage was applied against all of petitioners' advertising expenses

for the four-year period to arrive at a use tax deficiency of over $73,000.

The second audit was of the operations of the 10 Fineway stores for the period September 1, 1974 through February 28, 1979. Again, the underpayment method was ultimately used to arrive at a sales tax deficiency for one store for the test period of September 1978, which, upon extrapolation, fixed an amount of unpaid tax on total sales of all stores for the entire period under audit. A use tax assessment was also imposed, based upon examination of fixed-asset acquisitions for all of the Fineway stores during the year 1978. Store records showed invoices for fixed-asset purchases totaling $37,891 on which no sales tax was separately stated. Of these, $37,413 related to a purchase of cash registers from a single vendor. The aggregate tax due on the 1978 invoices was $3,031.28. The projection of the deficiency for the entire audit period was $5,189.04.

The third audit covered sales and use taxes for the operations of all 45 petitioners' stores from June 1, 1977 through August 31, 1980. Here, also, the auditor employed the same underpayment method of projecting the sales tax due for the audited period. As to the use tax, a test period of November 1979 was initially utilized for examination of recurring expenses, principally window signs, and an additional assessment was also made on the basis of a full audit of purchases of fixtures and equipment. At some point toward the end of the initial test audit, petitioners executed a written consent to the use of the test method. Subsequently, without amending the consent, the auditor extended the test period to include recurring expenditures from August 1979 through July 1980.

Upon administrative review, the State Tax Commission canceled all the assessments for additional sales tax. They credited the evidence submitted by petitioners showing that the underpayment method employed by the auditors to arrive at the sales tax deficiency was erroneous in that its underlying basis, the sales tax totals from cash register tapes, was patently unreliable. The Tax Commission ruled, however, that petitioners' proof was inadequate to establish their entitlement to a refund on sales tax paid. The Tax Commission upheld the final assessment of additional use tax. It found that the utilization of test periods was consented to by an appropriate officer of petitioners, and that they failed to sustain their burden of proving that the method of audit or the resultant assessment was erroneous. Petitioners then brought this CPLR article 78 proceeding, solely for the pur-

pose of annulling the Tax Commission's determination upholding the use tax assessment.

Petitioners' first and primary point in this proceeding attacks the validity of any utilization of a test-period audit to establish a use tax deficiency. They quote a finding by the Tax Commission regarding the first audit that all of petitioners' records "pertaining to the use tax were available [to the auditor] if she had asked for them", from which they argue that, since records were at hand permitting a full use tax audit, respondents must rely entirely on a theory of consent in order to validate the use of a test-period method. Petitioners further argue that the record does not establish a knowing and intelligent waiver of petitioners' right to a full audit. We disagree.

The evidence, in our view, clearly establishes that each of the three audits was to be a fully comprehensive, integrated examination of petitioners' operations as to both sales and use tax liability. It is equally clear that, as to the sales tax portion of the audits, (a) petitioners' records were inadequate to perform a full audit and (b) the taxes reported on petitioners' returns were themselves "estimated on the basis of external indices" (see, Tax Law § 1138 [a] [1]). Because of these factors, petitioners fully condoned the resort to a test-period method covering all aspects of their sales and use tax liability. As the first auditor explained, "it was agreed that April would be a test month across-the-board for everything". In regard to the second audit, the uncontested evidence was that the Fineway records for preacquisition operations were incomplete and that postacquisition purchase bills were missing. As to the third audit, petitioners executed a written consent to the use of a test period which stated that it was "in lieu of a detailed examination of my expense Purchase Invoices for the entire audit period", in which they also specifically reserved the right only to contest individual items and the results of the test (cf., Matter of Kennedy & Co. v Chu, 125 AD2d 773, 774). Thus, it can hardly be contended that petitioners at that point were not aware of their right to a full audit if the necessary records were accurate and available.* Petitioners' officer further conceded that, as to any aspect of the third audit and

---

* The validity of the written consent is not undermined, as petitioners contend, because it was not executed until the audit was nearly complete or because the auditor extended the test period without amending the written consent. There was evidence that petitioners orally consented to the use of the test period before it began, and that the extension of the test period was at the behest of petitioners.

respecting his oral consents to earlier audits, he agreed to a test period on the "same basis as is reflected on [the written consent]". Hence, the evidence was amply sufficient to support an inference of the existence of a valid, knowledgeable consent to the utilization of test periods for all three audits.

Alternatively, petitioners argue that the assessments for the first and second audits must be annulled because, in essence, the samplings were too small and too limited in duration to be a fair and accurate reflection of the actual tax due. While the samples were indeed limited, they were only applied and extrapolated to likewise limited, directly relevant categories of purchases, namely, advertising items in the first audit and fixed assets in the second audit. Thus, this is not a case where only a handful of transactions were projected against a large volume of total sales *(cf., Matter of Yonkers Plumbing & Heating Supply Corp. v Tully,* 62 AD2d 18, 21, *appeal dismissed* 44 NY2d 949). We have recently upheld the utilization of an even briefer test period for an audit of business operations over a time span similar in duration to those involved herein *(see, Matter of Meskouris Bros. v Chu,* 139 AD2d 813).

In stark contrast to the proof submitted at the administrative hearing by petitioners on the contested sales tax issues, in which they successfully demonstrated through documentary evidence and their own audit tests that the methodology and underlying data used by the Tax Commission in fixing the sales tax deficiency were inadequate and unreliable, petitioners adduced no similar evidence as to their expenditures and, therefore, failed to sustain their burden of proof that the use tax audits in question were erroneous either as to method or result *(see, supra).* Petitioners attempt to shift that burden to respondents, by suggesting that the auditors should have verified their findings by directly canvassing vendors, is likewise unavailing.

Determination confirmed, and petition dismissed, without costs. Kane, J. P., Weiss, Mikoll, Yesawich, Jr., and Levine, JJ., concur.